## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| PATRICIA L. AMOS, JAMES S. HUTCHISON, SALLY JONES, GEORGE OWENS, TERRY TAYLOR, JOHN FOSTER, ALEX OLSZYK, JOHN W. ZUZIK, ARTHUR RAMOZ, ROBERT RATLEFF, JOHN P. DETTY, VIRGINIA BAKEMAN, WILLIAM BRISON, MARK BRYAN, SHIRLEY M. BRYAN, RICHARD FISCHER, LINDSAY T. GRANGER, EDWARD LUCENTE, and RICHARD ROSS, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PPG INDUSTRIES, INC.;<br>PPG INDUSTRIES OHIO, INC.;<br>PPG RETIREMENT PLANS; GEORGIA GULF CORPORATION; AXIALL CORPORATION; and JOHN DOES 1 THROUGH 20,<br><br>Defendants | Case No. 2:05-cv-70<br><br>JUDGE MICHAEL H. WATSON<br><br>MAGISTRATE JUDGE<br> TERENCE P. KEMP<br><br><br><br>Class Action<br><br>Demand for Jury Trial |

## PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AND SUPPORTING MEMORANDUM

Plaintiffs Patricia L. Amos, James S. Hutchinson, Sally Jones, George Owens, Terry Taylor, John Foster, Alex Olszyk, John W. Zuzik, Arthur Ramoz, Robert Ratleff, John P. Detty, Virginia Bakeman, William Brison, Mark B. Bryan, Shirley M. Bryan, Richard Fischer, Lindsay T. Granger, and John P. Detty ("Plaintiffs"), by their counsel, respectfully move for certification of this action as a class action for (the "Class") under Fed.R.Civ.P. 23(b)(1)(A) and (b)(2).

Plaintiffs request that this Court certify the following Class:

All collectively bargained past, present, and future retirees of PPG (as well as the spouses, surviving spouses, and eligible dependents of these retirees) who:

(1)      while employed by PPG, were represented by the USW, the UAW, the IAM, the Alkali Workers, or the ICWUC (the "Unions")[1];

(2)      were eligible for retiree medical coverage pursuant to the terms of collectively bargained agreements and provisions between any Union and PPG; and

(3)      retired from, or before final judgment in this litigation will retire from, the following PPG facilities, on or after the dates indicated: Barberton (3/1/90); Circleville (10/1/86); Creighton (2/16/84); Crystal City (2/16/84); Cumberland (2/16/84); Delaware (2/16/86); Ford City (2/16/84); Fresno (5/16/84); Greensburg (3/25/84); Lake Charles (5/15/87); Mt. Zion (6/15/84); Natrium (3/1/87); and Springdale (11/1/84)[2]

as well as surviving spouses of active employees who have died before final judgment in this litigation and who at the time of such employees' death worked at one of the listed facilities (on or after the dates indicated), were represented by a Union, and were eligible to retire under the pension plan or with a Social Security benefit, making their spouse eligible for retiree medical coverage pursuant to the terms of collectively bargained agreements and provisions between any Union and PPG.

Specifically excluded from the Class are employees who were hired after the dates that PPG and the Unions negotiated that persons hired at those facilities after those dates were not entitled to retiree health benefits under an ERISA governed plan (plus their spouses and beneficiaries) if they

---

[1] The full names of the referenced unions ("Unions") are as follows:  the United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"); the International Chemical Workers Union Council of the United Food and Commercial Workers International ("ICWUC"); the Allied Chemical & Alkali Workers of America ("Alkali Workers"); the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"); and the International Association of Machinists ("IAM").  References to the Unions or to a particular Union include predecessors that have been merged into them.  The Alkali Workers became part of the ICWUC.

[2]  While PPG declined to provide Plaintiffs with the dates it used to determine which retirees would face benefit reductions effective August 1, 2001, that information was contained in the files of PPG's actuary, Mercer, which produced a chart of these dates which PPG provided to it for use in Mercer's actuarial evaluation of post-retirement benefits.  Exhibit 1.  Exhibits 1-35 are attached to the Declaration of Ellen M. Doyle In Support of Plaintiffs' Renewed Motion for Class Certification.

subsequently retired.[3]

Plaintiffs seek certification of the following two claims ("Class Claims") on behalf of the above-defined Class as to Defendants PPG Industries, Inc., PPG Industries Ohio, Inc., and PPG Retirement Plans; plus John Does 1 Through 20 (collectively, "PPG"):

Count I:   Violation of labor agreements, actionable under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

Count II:   Violation of Class Members' rights under employee benefit plans, actionable under Sections 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).

PPG and the Unions were parties to a series of collective bargaining agreements ("CBAs") governing the terms and conditions of the employment of Union represented employees at each location. In Count I, Plaintiffs allege that the CBAs providing for retiree health benefits are "contract[s] between an employer and a labor organization" within the meaning of LMRA § 301, 29 U.S.C. § 185. The contracts conferred upon all Class Members a contractually vested right to retiree health benefits throughout retirement. By unilaterally reducing this coverage notwithstanding the terms of the contracts, and the bargaining history with the unions, PPG breached these contracts. In Count II, Plaintiffs allege that PPG is

---

[3] The relevant agreements governing the rights of the proposed class to benefits are at Exhibits 2-11, by location. In the mid to late 2000s, PPG and the Unions representing the locations that were still being operated by PPG negotiated agreements providing that new hires would not be eligible for retiree medical coverage from the company, thereby cutting off PPG's obligation to provide retiree health care coverage to subsequently hired employees who later retired under CBAs with such provisions. For example, the Mt. Zion 2009 Booklet states that "[e]mployees hired on or after June 16, 2009 are not eligible to participate in a PPG retiree health care plan upon their retirement from PPG." Ex. 4 at 179, 184; Ex. 5, Fresno 2008 Booklet at 207, 211; Ex. 6, Springdale 2008 Booklet at 147, 151; Ex. 7, Barberton 2008 Booklet at 94, 97; Ex. 8, Lake Charles 2006 Booklet at 104, 113; Ex. 9, Natrium 2006 Booklet at 126; Ex. 10, Circleville 2004 Booklet at 92, 100: and Ex. 11, Delaware 2007 Booklet at 120, 128.

obligated to provide retiree health benefits to Class Members pursuant to CBAs which must be treated as ERISA plan documents.  PPG violated the terms of these plan documents by unilaterally reducing coverage for these benefits and, effective January 1, 2017, and eliminating its ERISA-governed plans with respect to the Medicare eligible retirees.  Plaintiffs' claims are actionable under ERISA § 502(a)(1)(B) and (a)(3), 29 U.S.C. § 1132(a)(1)(B) and (a)(3).

These Class Claims arise from PPG's breach of collectively bargained employee benefit plans, which occurred when PPG, effective August 1, 2001 and thereafter, unilaterally reduced Class Members' contractually vested retiree health benefits.  Class Members' benefits were created through collective bargaining between PPG and the Unions which represented retirees while they were employed. Successive labor agreements entered into between PPG and the Unions contained provisions which established PPG's obligation to provide retiree medical benefits throughout retirement, but with an offset for Medicare benefits once retirees and/or other participants become eligible for Medicare; and for the life of the retirees, until the death or alternatively the death or remarriage of the spouse, and for the period of dependency of the retiree's eligible dependents.

Despite these contract provisions, as well as other promises to provide benefits to Class Members throughout retirement, PPG shifted costs to Class Members beginning on and after August 1, 2001, and took the position that it was free to further reduce or even eliminate the benefits at any time.[4]

Effective January 1, 2017, PPG eliminated its employer-sponsored ERISA-governed retiree health plans for all of the members of the putative class who were Medicare-eligible as long as the CBA under which they retired had reached the end date of their general term dates

---

[4] A chart showing the cost-shifting imposed by PPG on members of the proposed Class on and after August 1, 2001 until January 1, 2014, which was prepared by PPG, is at Exhibit 12.

without consideration of the specific terms providing for the retiree health benefits to continue. For those members of the proposed Class, who are still alive and Medicare-Eligible as of January 1, 2017, PPG has offered only to establish joint Health Reimbursement Accounts ("HRAs") and pay in $125 per month for the retirees and their Medicare eligible spouses if they sign up for health coverage through One Exchange.  PPG also provides a "catastrophic" benefit for prescription drugs.  PPG also eliminated its ERISA plan benefit which had been in effect for more than thirty years of allowing retirees to make a monthly payment for themselves and their spouses to retain eligibility for PPG's retiree medical plans.[5]

Plaintiffs' Memorandum below at pps. 1-20 sets forth the reasons that this Court should certify this action as a class action as defined above.

---

[5] Information that PPG provided Medicare eligible members of the proposed Class regarding the elimination of ERISA-governed retiree health plans for all Medicare-eligible members of the proposed class, their replacement with HRAs, and the elimination of the PPG option to retain eligibility in its health plans which were effective as of January 1, 2017 are at Exhibits 13 and 14.

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

### I.    INTRODUCTION

For more than thirty years (1969 to August 1, 2001) PPG's union-represented employees in the proposed Class retired with and retained the medical benefits and contribution levels that were set forth pursuant to the collectively bargained agreements ("CBAs") in place at the time they retired.   Ex. 15, Karen Rathburn Tr. Vol. I at 20:25-21:7 and 21:25-22:3.  That coverage, negotiated through collective bargaining, provided for retirees' medical coverage to continue until they became Medicare-eligible and beyond, terminating only on their death.  As to surviving spouses, their retiree medical coverage continued until their death, or alternatively, until their death or remarriage.  Retirees' eligible dependents' coverage continued until the end of their dependency.

That coverage was unilaterally changed on August 1, 2001, when  (i) PPG announced that it need not provide any health plans or benefits  to existing or future members of the Proposed Class after the end of the general terms of the CBAs under which retirees in the Proposed Class retired;  (ii) PPG terminated its existing retiree health benefits plans which were provided pursuant to CBAs which had reached the general termination date set forth in the CBAs by or before August 1, 2001, and thereafter;  (iii) PPG transferred members of the Proposed Class out of the plans under which the retirees retired as of the date of the general termination dates in the CBAs; and involuntarily transferred them to a consolidated PPG retiree health plan which was not bargained; and allowed PPG to cancel or amend it at any time; and (iv) thereafter, PPG regularly increased the required premiums to maintain that retiree health plan and shifted greater costs to retirees and their dependents. See Ex. 1; Ex. 12.

Plaintiffs filed this action on January 20, 2005 and since that time have sought relief under the Labor Management Relations Act ("LMRA") and the Employee Retirement Income

Security Act ("ERISA"). ECF #1; ECF #293.

Plaintiffs now renew their request that this Court certify the Class defined above on pps. ii –iii of Plaintiffs' Motion for Class Certification.

## II.   SUMMARY OF THE FACTS

### A.   The History of Negotiations between the Unions and PPG

PPG is a global supplier of paints, coatings and glass with annual net sales of over $14 Billion and 45 U.S. manufacturing facilities. Ex. 16. At a number of those facilities, portions of PPG's work force were represented by the Unions.[6] Collective bargaining between PPG and the Unions dates back at least as far as 1940. See Ex. 17.

PPG and the Unions were parties to CBAs governing the terms and conditions of employment for hourly employees. Each CBA contained a "termination" or "duration" provision that provided that the CBA would continue "in full force and effect" to a specified date (usually three years after), at which point it could continue, be renegotiated, terminated or canceled pursuant to the process provided by the contract. See, inter alia, Ex. 2 at 186-88; Ex. 2 at 40, 42-43; Ex. 4 at 118, 130; Ex. 5 at 90, 109-110; Ex. 6 at 126-127; Ex. 7 at 35, 37; Ex. 8 at 101, 103; Ex. 9 at 56, 58; Ex. 10 at 73, 75; Ex. 11 at 36, 39-40. Pursuant to these provisions, the parties typically negotiated for a new CBA every three years. See generally Exs. 2-11. Following an exchange of proposals, the parties would ultimately reach a tentative agreement on a new CBA

---

[6] The USW represented employees at PPG's glass plants in **Creighton**, PA; **Cumberland**, MD; **Crystal City**, MO; **Ford City**, PA; **Greensburg**, PA; **Mt. Zion**, IL; and **Fresno**, CA. The USW also represented employees at PPG's coatings and resins plant in **Springdale**, PA.
 • The ICWUC represented PPG employees at the chemicals plant in **Natrium**, WV and the coatings and resins plant in **Circleville**, OH.
 • The IAM represented PPG employees at its chemicals plant in **Lake Charles**, LA.
 • The UAW represented PPG employees at its coatings and resins plant in **Delaware**, OH.
 • The Allied Chemical & Alkali Workers of America ("Alkali Workers") represented PPG employees at the **Barberton**, OH chemicals plant. The Alkali Workers recently became part of ICWUC.

2

that would be reduced to writing as a Memorandum of Agreement or Company Final Settlement offer (collectively, "MOAs"), which would usually be signed by Union and PPG representatives, and included all new or changed terms from the prior CBA.  The parties understood, and the MOAs usually recited, that unless modified by the MOA, all terms of the prior CBA remained in full force and effect. See Ex. 18 at 1; Ex. 19, Phil Abernathy Tr. at 17:16-19:5; Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1; Ex.  23 at 1; Ex. 24 at 1; Ex. 25 at 3; Ex. 26 at 1; Ex. 27 at 1; Ex. 28 at 1.

In 1969, the USW and PPG agreed that employees in PPG's glass plants in at Creighton, Cumberland, Crystal City, Ford City, Greensburg, Mt. Zion and Fresno would receive a comprehensive health benefits program.  This plan also provided for benefits for employees who retired.  Ex. 2 at 1, 5-6, 18; Ex. 3 at 1, 3-4; Ex. 4 at 1, 3; and Ex. 5 at 1, 3. This coverage was also negotiated at Springdale the following year. Ex. 6 at 1, 5. Similar agreements, providing employees and retirees with health care coverage, subject to a carve-out upon attaining Medicare eligibility, were in place between the Unions and PPG at Barberton since at least 1971, Ex. 7 at 5, 6, 8, 10; Lake Charles since at least 1973, Ex. 8 at 6, 7, 9; Natrium since at least 1974, Ex. 9 at 8, 11-12; Circleville since at least 1976, Ex. 10 at 1, 6; and at Delaware starting in 1986, Ex. 11 at 1, 5, 11, 17-18.

For PPG, the process of collective bargaining "was tightly controlled out of [PPG's General Office in] Pittsburgh," Ex. 29, Adam Stevenson Tr. at 20:20-21-17, with Sam Hoffman and later Phil Abernathy from Pittsburgh serving as PPG's chief negotiators.  Id. at 16:8-16:20. Karen Rathburn testified that the labor negotiators were centralized in PPG in the downtown Pittsburgh office, and the chief center seat negotiator was someone in the industrial relations group in Pittsburgh.  Ex. 31, Vol. II 253:11-254:11. Rathburn was selected by PPG as it 30(b)(6) representative.  A SBU HR director, Faix, testified that the handling of previously retired persons was handled out of Pittsburgh. Ex. 30, Faix Tr. at 41:24-42:10.

At all of these locations, these collectively bargained agreements, which covered medical and prescription drug coverage, along with the parties' agreements on other welfare benefits, were contained in Group Insurance Plan booklets, later called Group Benefit Plan booklets, hereinafter collectively "**Booklets**." See, Ex. 2 at 13; Ex. 7 at 6; Ex. 8 at 7; and generally Exs. 2-11.

The Booklets, unlike the CBAs that contained the parties' agreement with respect to most other matters, were not signed documents.  Following the passage of ERISA in 1974, PPG treated the pre-existing Booklets as the "Summary Plan Descriptions" ("SPDs") required by the new law.  Dan Logan, PPG's Director of Employee Benefits at the time of his retirement in 1999, testified that "the Group Insurance Benefit Booklet was the name of the booklet that had been there for years. But, in essence, it is – under ERISA, the summary plan description." Ex. 32 at 9:20-10:5; and 62:15-18

While there were some minor differences in each location's Booklet, they were similar as to retiree health benefits.  For example, to inform employees what would happen to their health benefits upon their retirement, the Creighton, Cumberland, Ford City and Crystal City 1969 Booklet[7] was the first to contain the following provision, under a section titled "Provisions Applicable If You Cease Active Work":

> *Retirement*
>
> **At the time you retire** under the Pension Agreement (other than a Deferred Vested Pension), or the Social Security Act, whichever shall occur sooner, the following provisions shall be applicable…(c) **Blue Cross and Blue Shield Benefits – Such coverage will be continued in effect thereafter, without cost to you**, in accordance with paragraph 7.5.

---

[7] These four locations bargained in tandem with PPG and were known for a time as the "Multi-Plant" unit. Over time, the USW locals at Ford City and Crystal City began to bargain individually. See Ex. 2.

Ex. 2 at 13, 17-18. Substantially identical language, providing that upon retirement "under the Pension Agreement" benefits "**will be continued**" or "**will be continued in effect thereafter**" until attainment of Medicare eligibility at which time benefits were to be offset by Medicare benefits, was also first contained in the Fresno 1969 Booklet, Ex. 5 at 4, 9; the Springdale 1970 Booklet, Ex. 6 at 8, 10; the Greensburg 1972 Booklet,  Ex. 3 at 10, 15-16; and the Mt. Zion 1972 Booklet, Ex. 4 at 11, 15.

The Booklets for the other locations also contained "Retirement" provisions that were similar to those of the USW locals.  For example, the Barberton 1978 Booklet was the first to contain the following language:

> **At the time you retire under the Pension Agreement**, the following provisions will be applicable to your coverage under the Program:  (c) **Medical Care Benefits and Major Medical Expense Insurance**. Such coverage, provided enrollment is in effect, **will be continued in effect thereafter** subject to the provisions of paragraphs 2.2 [requiring enrollment and the payment of a required contribution], 3.2 [limiting eligible dependent to the retiree's spouse] and 3.3 [providing for dependent's eligibility date], but will be reduced by any benefit provided by Medicare pursuant to paragraph 10.14.

Ex. 7 at 11, 18-19.

Substantially similar language, providing that upon retirement benefits "**will be continued**" or "**will be continued in effect thereafter**" until Medicare eligibility and the offset by Medicare benefits, also first appeared in the Lake Charles 1975 Booklet, Ex. 8 at 10, 16; the Circleville 1976 Booklet, Ex. 10 at 1, 6; the Natrium 1977 Booklet, Ex. 9 at 13, 21; and the Delaware 1986 Booklet, Ex. 11 at 11, 17-18.  This language of the "Retirement" provisions remained in substantially similar form in every subsequent version of the Booklets for all locations.  See, e.g., Ex. 2, Creighton 2003 Booklet at 297, 305; Ford City 1994 Booklet at 231, 238-39; Creighton and Cumberland 1993 Booklet at 203, 208; Crystal City 1990 Booklet at 179, 182; Ex. 3, Greensburg 1993 Booklet at 134, 140; Ex. 4, Mt. Zion 2009 Booklet at 179, 187; Ex.

5, Fresno 2011 Booklet at 224, 233-34; Ex. 6, Springdale 2012 Booklet at 164, 173-74; Ex. 7,

Barberton 2011 Booklet at 108, 114; Ex. 8, Lake Charles 2012 Booklet at 136, 142; Ex. 9,

Natrium 2010 Booklet at 144, 150; Ex. 10, Circleville 2012 Booklet at 117, 122; Ex. 11,

Delaware 2014 Booklet at 132, 141.

      In all of the Booklets, the section titled "Provisions Applicable If You Cease Active

Work" also contained provisions titled "Death." For example, the Creighton, Cumberland, Ford

City and Crystal City 1972 Booklet was the first to introduce the following language:

> *Death*
>
> **Blue Cross, Blue Shield and Prescription Drug coverage ceases on the last day of the month in which death occurs**.  However, a surviving spouse and eligible dependents other than sponsored dependents of either an insured employee retired under the pension plan or [sic] other than a Deferred Vested Pension or an active employee who is eligible to retire under the Pension Plan, but died before retiring, shall be eligible to remain as participants in the Blue Cross, Blue Shield and Prescription Drug program.  The Blue Cross, Blue Shield and Prescription Drug Benefits for the surviving spouse **will continue in force until the spouse's death** and for such eligible dependents until they cease to be eligible dependents as defined in the Program.

Ex. 2 at 19, 22. (emphases added).

      Virtually identical language, providing that the coverage for the surviving spouse of a

retiree would continue "**until . . . death**" and that surviving dependents' coverage would

continue until the end of the period of dependent eligibility, was also first included in the

Greensburg 1972 Booklet, Ex. 3 at 10, 16; the Mt. Zion 1972 Booklet, Ex. 4 at 9, 16; the Fresno

1972 Booklet, Ex. 5 at 10, 14; and the Springdale 1975 Booklet, Ex. 6 at 13, 20.

      The "Death" provisions in the other Unions' Booklets were similar. For example, the

Circleville 1976 Booklet was the first to contain the following language:

> **Medical Expense Insurance and Dental Expense Benefits cease on the last day of the month in which death occurs**. … The surviving spouse and eligible dependents of a retired employee who retired under the Pension Agreement may

continue in the applicable Program **for life or until remarriage** by timely paying
the required premium.

Ex. 10 at 1, 7 (emphasis added). Substantially similar language, providing medical coverage

would cease as of the last day of the month in which death of the retiree occurs, and providing

for specific provisions for continued coverage for surviving spouses and dependents was also

agreed upon at each of the other locations. See, e.g., Ex. 11, Delaware 1986 Booklet at 11, 18

("medical care program for the surviving spouse [of a retiree] will continue **until the spouse's**

**death or remarriage**"); Ex. 8, Lake Charles 1987 Booklet at 27, 33 (retiree's surviving spouse

"shall be eligible to remain in the program **until the widowed spouse's remarriage**"); Ex. 9,

Natrium 1990 Booklet at 46, 52 (surviving spouse of a retiree "may continue coverage… **until**

**the earlier of the month in which such spouse remarries or the month such spouse's death**

**occurs**"); Ex. 7, Barberton 1990 Booklet at 25, 32 (surviving spouse of a retiree entitled to

coverage "**until their death or remarriage**") (emphases added). As with the "Retirement"

provisions, once agreed upon and added to the Booklets, this "Death" language has remained in

substantially similar form in every subsequent version of the Booklets. See, e.g., Ex. 2,

Creighton 2003 Booklet at 297, 306; Ford City 1994 Booklet at 231, 239; Creighton and

Cumberland 1993 Booklet at 203, 209; Crystal City 1990 Booklet at 179, 182); Ex. 3,

Greensburg 1993 Booklet at 134, 141; Ex. 4, Mt. Zion 2009 Booklet at 179, 188; Ex. 5, Fresno

2011 Booklet at 224, 234-35; Ex. 6, Springdale 2011 Booklet at 164, 174; (Ex. 7, Barberton

2011 Booklet at 108, 115; Ex. 9, Natrium 2010 Booklet at 144, 150-51; Ex. 10, Circleville 2012

Booklet at 117, 122-23; Ex. 11, Delaware 2014 Booklet at 132, 141-42.

Once the Unions had bargained and obtained retiree health coverage for retirees and their

spouses, the parties occasionally agreed to reductions to the benefits that active employees would

receive in the future upon retirement ("future retirees"), but never agreed to reduce the benefits

of existing, "current" retirees, and their benefits were never reduced, notwithstanding the expiration of the CBA under which they had retired. See Ex. 15, Rathburn Tr. Vol. I at 43:24-44:12, 94:20-95:13; Ex. 30, Faix Tr. at 40:12-16. Thus, pursuant to the terms of the parties' agreements, from 1969 until mid-2001, Union-represented employees received and retained the health benefit plans (including the required premium contribution levels) that were in place at the time of their retirement, throughout their retirement. See Ex. 15, Rathburn Tr. Vol. I at 20:25-21:7, 21:25-22:3; Ex. 30, Faix Tr. at 40:12-16.

**B.    PPG changes benefits for current retirees in 2001.**

In 2001, PPG announced that it was introducing "new medical and prescription drug options for retirees effective July 1, 2001." Ex. 33. By letter dated January 24, 2001, PPG's Chairman and CEO informed retirees that "[u]nder these new plans, future health care cost increases will be shared between PPG and retirees annually on a 50/50 basis, with the next anticipated rate increase to become effective January 1, 2003." Id.[8] Thereafter, PPG provided a "Retiree Health Care Enrollment Guide" that described the initial changes to retiree health care coverage — including new increased monthly premium requirements — that would be effective August 1, 2001. See Ex. 34, Part 1, at 9-11; Ex. 34, Part 2, at 16, 20-27.

Thus, effective August 1, 2001 and thereafter, despite years of contrary practice under the negotiated terms of the CBAs and the Booklets, retirees were no longer permitted to stay in the negotiated ERISA health plans in effect when they retired. Instead the retirees were involuntarily transferred into new PPG retiree health plans which were not negotiated with the unions, and which expressly allowed PPG to change or terminate retirees' coverage, benefits,

---

[8] Ms. Rathburn testified that the "50/50 cost sharing policy" was a "guideline by which [PPG would] estimate the incremental increase in coverage year over year [so] that PPG would absorb 50 percent of the increase, and 50 percent of the increase would be shared with participants." See Ex. 15, Rathburn Tr. Vol. I at 71:21-72:7.

and increase retirees' cost sharing at any time. Ex. 35, Part 1, at 9; Ex. 35, Part 2, at 95-96.

PPG's changes to the retiree health benefits provided to collectively bargained retirees only applied to those retirees that PPG identified as "post-reservation" retirees, based upon their date of retirement. Admitted by PPG at ECF #283, ¶ 18; Ex. 15, Rathbun Dep. Tr. 24:23-26:13; 133:12-134:3); Ex. 1. The "reservation date" refers to the effective date of the first CBA in effect when the corresponding Booklets were first revised by PPG to insert the following non-bargained language:

> **The Company will continue the benefits described herein for active and retired employees *consistent with the terms and conditions of the labor agreement* for the duration of such agreement**.

This language was first included in the Booklets between 1984 and 1990, and accordingly, these "reservation dates" are included in Plaintiffs' definition of the proposed class. (See the motion for class certification above at p. ii.)[9] Once added, substantially similar language has remained in each subsequent version of the Booklets.

PPG reduced benefits further between 2003 and 2014, in the form of ever-increasing contributions, higher deductibles, and new and higher co-payments, with separate cost structures for pre-Medicare and Medicare-eligible retirees. See Ex. 15, Rathbun Tr. Vol. I at 40:13-41:2; Exs. 12 and 13. PPG imposed these changes uniformly with the only differentiation being whether the individual was eligible for Medicare. Ex. 12; Ex. 31, Rathbun Tr. Vol. II at 172:24-

---

[9] The first Booklets to contain the "durational language" quoted above are found in the 1984 Booklets for Creighton, Cumberland, Ford City, and Crystal City Ex. 2, at 55, 57; 65, 68; Greensburg, Ex. 3 at 41, 44; Mt. Zion, Ex. 4 at 39, 42; Fresno, Ex. 5 at 37, 40; and Springdale, Ex. 6 at 32, 35; the 1986 Booklets for Circleville, Ex. 10 at 20, 22; and Delaware, Ex. 11 at 11, 14; the 1987 Booklets for Lake Charles, Ex. 8 at 27, 30; and Natrium, Ex. 9 at 31, 34; and the 1990 Booklet for Barberton, Ex. 7 at 25, 29. With the exception of a minor change in the available prescription drug program, PPG did not change the benefit plans or premiums of the collectively bargained "pre-reservation" retirees who retired at any time prior to the "reservation dates," i.e. under CBAs for which the corresponding Booklet did not contain what PPG now describes as "duration language." Ex. 15, Rathbun Dep. Tr. 30:21-31:3; Ex. 1; see also ECF #283, ¶ 18.

173:14.

Effective January 1, 2017, PPG evicted from its ERISA-governed retiree health care plan(s) **all** of the Medicare-eligible Plaintiffs and members of the Proposed Class. Instead, PPG now provides them **only** Health Reimbursement Accounts ("HRAs"), funded by it at a rate of $125 per month. Those payments can be used only for the purchase of substitute health coverage available through Towers Watson's OneExchange marketplace. If retirees do not enroll via OneExchange, they are not eligible for the PPG-funded HRA in 2017. Exs. 13 and 14

## III. ARGUMENT

### A. Basic Principles

Rule 23(a) sets out the following threshold requirements:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2550 (2011).

The Court must conduct a "rigorous analysis" to confirm that the requirements of Rule 23 are satisfied. Id. at 2551. However, both the Sixth Circuit and Supreme Court have recently emphasized that permissible inquiry in to the merits of plaintiffs' claims at the class certification stage is limited:

> Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

In re Whirlpool Corporation Front–Loading Washer Prod. Liab. Litig., 722 F.3d 838, 851 (6th Cir. 2013) (quoting Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 133 S.Ct. 1184, 1194–95 (2013), and Dukes, 131 S.Ct. at 2552 n.6). As the Sixth Circuit explains, the Supreme

Court's post-Dukes decision in Amgen "admonishes district courts to consider at the class

certification stage only those matters relevant to deciding if the prerequisites of Rule 23 are

satisfied." Id. In other words, "district courts may not 'turn the class certification proceedings

into a dress rehearsal for the trial on the merits.'" Id. at 851-52 (citation omitted).

### B. Retiree Health Cases Are Almost Invariably Certified

Retiree health cases present claims concerning the meaning of common provisions in

collectively bargained agreements, which readily lend themselves to class treatment. Courts have

almost invariably granted class certification in cases concerning collectively bargained retiree

health benefits. See, e.g., USW v. Kelsey-Hayes Co., 290 F.R.D. 77 (E.D.Mich. 2013); Zino v.

Whirlpool Corp., 2013 WL 4544518, at *3 (N.D.Ohio Aug. 27, 2013); Sheick v. Auto

Component Carrier, LLC, 2010 WL 3070130 (E.D.Mich. Aug. 2, 2010); Ginter v. Whirlpool

Corp., 2009 WL 198746 (W.D.Mich. Jan. 23, 2009); Witmer v. Acument Global Tech., Inc.,

2009 WL 174916 (E.D.Mich. Jan. 26, 2009); Ames v. Robert Bosch Corp., 2009 WL 803587

(N.D.Ohio 2009); Sloan v. BorgWarner, Inc., 263 F.R.D. 470 (E.D.Mich. 2009); Cates v. Cooper

Tire and Rubber Co., 253 F.R.D. 422 (N.D.Ohio 2008); Prater v. Ohio Educ. Ass'n, 2008 WL

2566364 (S.D.Ohio June 26, 2008); Winnett v. Caterpillar, Inc., 2007 WL 2044098 (M.D.Tenn.

July 12, 2007); Kerns v. Caterpillar, Inc., 2007 WL 2044092 (M.D.Tenn. July 12, 2007); Reese

v. CNH Am., LLC, 227 F.R.D. 483 (E.D.Mich. 2005).[10]

---

[10] Review of Circuit court merits rulings further shows that certification is almost universal in the
retiree health context. See, e.g., Gallo v. Moen, Inc., 813 F.3d 265 (6th Cir. 2016); Moore v.
Menasha Corp., 690 F.3d 444 (6th Cir. 2012); Bender v. Newell Window Furnishings, Inc., 681
F.3d 253 (6th Cir. 2012); Cole v. ArvinMeritor, Inc., 549 F.3d 1064 (6th Cir. 2008); Noe v.
PolyOne Corp, 520 F.3d 548 (6th Cir. 2008); McCoy v. Meridian Automotive Systems, Inc., 390
F.3d 417 (6th Cir. 2004); Alday v. Raytheon Co., 693 F.3d 772 (9th Cir. 2012); Quesenberry v.
Volvo Trucks North America Retiree Healthcare Benefit Plan, 651 F.3d 437 (4th Cir. 2011);
Stewart v. KHD Deutz of Am. Corp., 980 F.2d 698 (11th Cir. 1993).

<u>Office and Professional Employees International Union, Local 494 v. International</u>

<u>Union, United Automobile, Aerospace and Agricultural Implement Workers of America</u>, 2015

WL 6774248 (E.D.Mich. Nov. 6, 2015) is a more recent case alleging similar claims to the

claims asserted here of the right of retirees to continuing medical benefits under ERISA and the

LMRA.  In May of 2015 that court certified a class for purposes of consideration of a class

settlement, <u>id.</u> at *5, finding commonality and typicality "notwithstanding that retirees have been

covered by different collective bargaining agreements."  <u>Id.</u> at *6.  <u>See</u> <u>also</u> <u>Ford v. Federal-</u>

<u>Mogul Corporation</u>, 2015 WL 110340 (E.D. Mich., Jan. 7, 2015) (approving settlement class

certification for retirees and beneficiaries who challenged modifications to their health benefits

under ERISA and the LMRA).

 Other recent decisions from this Circuit support class certification.  In <u>Wilson v. Anthem</u>,

2017 WL 56064 (W.D.Ky. Jan. 4, 2017), the court certified a class of insureds, participants and

beneficiaries under health insurance policies issued or administered by Anthem Health Plans of

Kentucky.  In <u>Jammal v. American Family Ins. Group</u>, 2016 WL 815576 (N.D.Ohio, Mar. 2,

2016) the court certified a class action for agents claiming entitlement to ERISA benefits.  Of

course, this Court also previously found that class certification was appropriate with respect to

certain of Plaintiffs' now-settled claims against Axiall defendants.  (ECF #320).

 **C.** **The Proposed Class Is Sufficiently Numerous To Satisfy Rule 23(a)(1)**

 Rule 23(a)(1) requires that a certified class be "so numerous that joinder of all members

is impracticable."  The "sheer number of potential litigants in a class, especially if it is more than

several hundred, can be the only factor needed to satisfy Rule 23(a)(1)."  <u>Bacon v. Honda of Am.</u>

<u>Mfg, Inc.</u>, 370 F.3d 565, 570 (6th Cir. 2004).

In <u>Witmer</u>, 2009 WL 174916, the court certified a class where there were 64 total

subclass members. <u>Id.</u> at 4 and n.6. This Court has certified a class of 41. <u>Beard v. Dominion</u>

<u>Homes Fin. Serv., Inc.</u>, 2007 WL 2838934, at *4 (S.D.Ohio Sept. 26, 2007) (Watson, J.)

On November 25, 2014, PPG produced a spreadsheet identifying the persons in the

putative class as of that date. There were 5,741 names listed, including some 1,409 class

members who had died. <u>See</u> (ECF #233, Hurt Decl. ¶ 3).

### D. The Proposed Class Shares Common Questions Of Fact And Law For Which There Are Common Answers

Rule 23(a)(2) requires "questions of law or fact common to the class." Class claims must

depend upon a common contention that is capable of classwide resolution. <u>Dukes</u>, 131 S.Ct. at

2551. There need be only one such common question to certify a class. <u>In re: Whirlpool</u>, 722

F.3d at 853.

In its Answer, PPG justifies its benefit reductions for the proposed Class on the basis that

"Plaintiffs' right to retiree medical benefits contained in CBAs between PPG and [the Unions]

expired at the expiration of the CBA in effect at the time retirees retired." (ECF #296, ¶¶ 2, 7).

PPG further claims "the right to modify, reduce or eliminate retiree medical benefits at the

expiration of the CBA in effect at the time a retiring employee retires." (ECF #296, ¶ 3).

PPG's contention that it could unilaterally reduce or eliminate retiree medical benefits at

the end date of the general durational provisions of the CBAs, notwithstanding the more specific

durations for these benefits, including until the attainment of Medicare eligibility at which time

benefits are to be reduced by Medicare benefits; until the death or alternatively the death or

remarriage of the spouse; and until the end of the dependency of the dependent, constitute

overarching legal issues, the disposition of which are likely to drive resolution of the lawsuit.

Plaintiffs and the proposed Class claim that their collective-bargained retiree medical

benefits were intended to survive the general duration of the CBAs themselves, and continue through the duration of the more specific terms bargained between the Unions and PPG. Because these terms are common among the collectively bargained provisions governing the benefits of all of the Proposed Class Members, the Court's review of these provisions and application of controlling law will evoke common answers likely to drive resolution of this lawsuit. Moreover, the practice with respect to retiree medical benefits was the same prior to the challenged changes at issue here. At all 13 locations, when Union-represented employees retired, they received and retained the health benefit plans and required premium contribution levels that were in place at the time of their retirement, throughout their retirement, notwithstanding CBA expiration.

Similarly, since PPG first implemented its 2001 changes, it has treated the proposed Class in the same way. PPG has produced a chart which shows the identical changes made to the contributions and benefits for **all** members of the proposed Class from August 1, 2001 through January 2014. See Ex. 12. PPG's chart of uniform benefit changes demonstrates that the Plaintiffs' claims present common questions of law and fact law to which there will be common answers for all Class Members. Moreover, PPG, effective January 1, 2017, evicted all of the Medicare eligible retirees in the proposed Class from its ERISA-governed retiree health plans and announced that hereinafter it would provide them only HRAs.

The common questions presented in this case include:

- Whether a general duration clause in the Booklets trumps or is modified by specific durational provisions setting forth when health benefits terminate for retirees' spouses and their dependents;

- Whether use of language stating that benefits will be provided until the retiree reaches Medicare age and that after eligibility for Medicare benefits will continue but with an offset for Medicare benefits evidences an intent for benefits to be provided until and after the age for Medicare eligibility;

- Whether PPG has terminated the ERISA-governed retiree health plans for all Medicare

14

eligible Plaintiffs and members of the Proposed Class effective January 1, 2017

- Whether PPG has terminated the opportunity which it provided to members of the Proposed Class since 2001 to retain their eligibility in its retiree health plans while participating in non-PPG-sponsored plans.

Various retiree health cases support class certification under these common circumstances. See Bittinger v. Tecumseh Products Co., 123 F.3d 877, 885 (6th Cir. 1997) ("Though the level of claimed injury may vary throughout the class . . . the basic injury asserted is the same: Tecumseh violated the terms of the collective bargaining agreements by unilaterally terminating fully-funded lifetime benefits"); Reese, 227 F.R.D. at 487.

Finally, Plaintiffs note that "Federal courts considering commonality have held that it does not matter that proposed Class Members retired in different years or under different agreements." Sheick, 2010 WL 3070130, at *2 (citing Reese, 227 F.R.D. 483); see also Mick v. Level Propane Gases, Inc., 203 F.R.D. 324, 331 (S.D.Ohio 2001) (certifying class in a contract case and observing that "[t]he existence of different contracts does not, however, preclude relief on class basis when the conduct complained of centers on a common issue ..."); Reese, 227 F.R.D. at 486 (finding commonality requirement met where class members retired under different contracts in different years); Fox v. Massey–Ferguson, Inc., 172 F.R.D. 653, 661–62 (E.D.Mich.1995) (commonality test met where plaintiffs, although asserting claims under various agreements for "varying amounts of damages," all challenged the decision to alter retirement healthcare benefits). See also In re Whirlpool, 722 F.3d 838. Further, this Court has bifurcated liability and damages by order dated October 31, 2014 (ECF # 224), assuring that common liability questions will be addressed during the first trial.

### E. The Proposed Class Representatives' Claims Are Typical

Rule 23(a)(3) requires that "the claims…of the representative parties [be] typical of the claims…of the class." "A claim is typical if it arises from the same event or practice or course of

conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." Beattie v. CenturyTel, Inc., 511 F.3d 554, 561 (6th Cir. 2007).  A representative's claim may be considered typical, despite the fact that evidence relevant to his or her claim varies from other class members, some class members would be subject to different defenses, and the members may have suffered varying levels of injury.  Bittinger, 123 F.3d at 884–85; Kerns, 2007 WL 2044092, at *5; Reese, 227 F.R.D. at 487–88.

The Class Representatives' claims here are typical of those of the Class.  Like all Class Members, the Class Representatives' retiree benefits have been improperly reduced, in violation of labor contracts and ERISA plan provisions by PPG's actions directed against all members of the proposed Class on and after August 1, 2001.  PPG has injured all Class Members in the same way.

### F.     The Proposed Class Representatives Are Adequate To Represent The Class

Under Rule 23(a)(4), the Court must determine whether "the representative parties will fairly and adequately protect the interests of the class."  This means "(1) the representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." Kelsey-Hayes, 290 F.R.D. at 81 (quoting Senter v. General Motors Corp., 532 F.2d, 511, 525 (6th Cir. 1976)).  This second requirement "usually will be the case if the representatives are 'part of the class and possess the same interest and suffer the same injury as the class members.'" UAW v. General Motors Corp., 497 F.3d 615, 626 (6th Cir. 2007).  In General Motors, the court found that the named representatives and class members all shared a common claim — that the retirees' healthcare benefits were vested under the collective bargaining agreements.  Id.

As in General Motors, Class Representatives here are members of the Class that they seek to represent, and have every incentive to safeguard the benefits they were promised.

Indeed, Class Representatives' legal claims are identical or very similar to the claims of all other Class Members.  In addition, the Class Representatives and Class Members have been damaged by PPG's same alleged misconduct, and, as a result, each has precisely the same interest in achieving the maximum recovery. It bears repeating that PPG imposed changes described supra at 13-4, on a uniform basis; the only differentiation is whether the individual was eligible for Medicare.  Ex. 12; Ex. 31, Rathburn Tr. Vol. II at 172:24-173:14.  Furthermore, nothing suggests that there are any conflicting or antagonistic interests between the class representatives and the Class.

In Cates, the court found that, contrary to the defendant's argument, class representatives were adequate to represent class members formerly employed at a plant where no class representative had been employed.  253 F.R.D. at 430.  The court reasoned that "[b]ecause the gravamen of plaintiffs' claim turns on Cooper's conduct towards all retiree benefit plans, Cooper's argument directly contradicts Sixth Circuit precedent."  Id. (citing Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 424 (6th Cir. 1998), approving class representative in one ERISA plan to represent class members in other plans, where gravamen of dispute turned on defendant's general practice and conduct towards all affected plans).  See also Wilson v. Anthem, 2017 WL 56064, (W.D.Ky. Jan. 4, 2017) (where the court also certified a multi-plan class subjected to common conduct by their health plan administrator).

Adequacy of representation turns in part on the competency of counsel.  General Motors, 497 F.3d at 626.  Counsel's satisfaction of Rule 23(g) standards are set forth below.

### G.  Plaintiffs' Counsel Should Be Appointed As Class Counsel

Rule 23(g)(A) requires that the Court consider the following factors:

(i)      the work counsel has done in identifying or investigating potential claims in the action;

(ii)     counsel's experience in handling class actions, other complex litigation,

and the types of claims asserted in the action;

(iii)     counsel's knowledge of the applicable law; and

(iv)     the resources that counsel will commit to representing the class.

These requirements are easily satisfied here.  This lawsuit has been pending since 2005 and the Court has had ample time to assess the quality of the Plaintiffs' Counsel's work. Plaintiffs succeeded in getting the initial dismissal of this action reversed, have defeated a motion to transfer, and obtained leave to amend over PPG's objections.  Plaintiffs' Counsel also negotiated a settlement in this case for the Axiall Settlement Class which was approved by this Court by Order dated August 13, 2015 (ECF #320).

The Class Representatives' attorneys are William Payne, Ellen M. Doyle, Pamina Ewing, Joel Hurt, and Ruairi McDonnell from the law firm of Feinstein Doyle Payne & Kravec LLC ("FDPK"); Timothy Cogan from the firm of Cassidy Cogan Shapell & Voegelin LC ("Cogan"); and Barry Macey from the firm of Macey Swanson & Allman ("Macey").  FDPK, Cogan and Macey bring a wealth of experience in litigating retiree benefit and LMRA and ERISA class-action cases, and they are thoroughly familiar with the applicable law.  See Second Declaration of Ellen M. Doyle, with attached resumes of plaintiffs' counsel filed herewith.  Plaintiffs' counsel have vigorously represented the interests of the Class, and will continue to do so.

In General Motors, the district court appointed Mr. Payne and other FDPK attorneys to represent 500,000 retirees.  2006 WL 891151, *12.  On appeal, the Sixth Circuit confirmed that counsel was well qualified.  497 F.3d at 626 ("In view of Payne's background, both classes would have been hard pressed to find someone with greater "experience in handling class actions...and claims of the type asserted in the action" or an attorney with more "knowledge of the applicable law.").

Class Representatives' attorneys have and are committed to spending the resources

18

necessary to represent the class.  Among other things, counsel have spent twelve (12) years

litigating this case, and have engaged in extensive discovery including the review of more than

100,000 pages of documents; handling 38 depositions; and have retained and provided PPG with

the report of their actuarial expert. Declaration of Ellen Doyle, ¶ 9.

### H.     The Proposed Class Satisfies The Requirements Of Rule 23(b)

A class must also satisfy one of the subdivisions under Rule 23(b).  In retiree health

cases, courts routinely certify classes under Rule 23(b)(1) and (b)(2).  See cases cited *supra* at p.

7, and in particular Sloan, 263 F.R.D. at 477 (E.D.Mich. 2009) ("As to class certification under

Rule 23(b)(1)…separate adjudications of Plaintiffs' claims for injunctive or declaratory relief

clearly presents a risk of incompatible standards being applied [by company defendants] to

different members of the Class"); Fox, 172 F.R.D. at 665; Reese, 227 F.R.D. at 489; Kerns, 2007

WL 2044092, at *8–9.

### 1.     Class certification is warranted under Rule 23(b)(1)(A)

Under Rule 23(b)(1)(A), the Court may certify a class if:

> the prosecution of separate actions by or against individual members of the class
> would create a risk of (A) inconsistent or varying adjudications with respect to
> individual members of the class which would establish incompatible standards of
> conduct for the party opposing the class…

In Reese, the court concluded that Rule 23(b)(1)(A) certification was appropriate because "there

is a risk of inconsistent results if the 1450 retirees and surviving spouses of retirees file

individual lawsuits to challenge [the former employer]'s threatened modification of their health

insurance benefits."  227 F.R.D. at 489; see also Kelsey-Hayes, 290 F.R.D. at 82 (citing "the

many district court cases from this Circuit concluding that class certification in retiree actions

concerning collectively bargained for health care benefits is appropriate under Rule 23(b)(1)").

Given that there are more than 5000 Class Members (including deceased members),

inconsistent results are almost inevitable if individual suits were required to be filed.

### 2. Class certification also is appropriate under Rule 23(b)(2)

Certification under Rule 23(b)(2) is appropriate when "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief

or corresponding declaratory relief is appropriate respecting the class as a whole."  "Courts

routinely certify claims challenging an employer's modification of health care benefits under

Rule 23(b)(2), holding that, in such cases, the employer's alleged conduct is directed at the class

as a whole and hence class-wide injunctive or declaratory relief is appropriate."  UAW v. Ford

Motor Co., 2008 WL 4104329, at *21 (E.D.Mich. Aug. 29, 2008); Kelsey-Hayes, 290 F.R.D. at

83.

Further, and as observed in Gooch v. Life Investors Ins. Co. of America, 672 F.3d 402,

427 (6th Cir. 2012), Rule 23(b)(2) certification is appropriate when plaintiffs seek a declaration

about the meaning of a contract (discussing Dukes, 131 S.Ct. at 2551); see also Fox, 172 F.R.D.

at 665.  Here, PPG's decision to impose benefit reductions in 2001, and thereafter, on the basis

of the general terms of the CBAs without regard to the specific durational provisions negotiated

for retirees, their spouses and dependents, affected the entire Class, making entry of class-wide

injunctive and declaratory relief appropriate.[11]

### CONCLUSION

For these reasons, Plaintiffs respectfully request this Court certify the proposed Class,

and appoint the Class Representatives and Class Counsel to represent the Class.

---

[11] As noted, this Court has bifurcated proceedings in this case between liability and damages phases and stayed all discovery concerning damages.  Plaintiffs submit that the liability issues in this case are plainly suitable to certification under Rule 23(b)(1) and (b)(2), and that certification under Rule 23(b)(3) need not be considered, if at all, until the damages phase.

Respectfully submitted,

Dated:  May  9, 2017

 s/ William T. Payne
   William T. Payne

Timothy F. Cogan,
Ohio Bar I.D. No.  0011494

Feinstein Doyle Payne & Kravec LLC
*Pittsburgh North Office*
12 Eastern Avenue, Suite 203

Cassidy, Cogan Shapell & Voegelin, L.C.
The First State Capitol
1413 Eoff Street
Wheeling, WV
Phone:  (304) 232-8100
FAX:  (304) 232-8200
Email:  tfc@cmcvlaw.com

Pittsburgh, PA  15215
Phone:  (412) 492-8797
Cell:  (412) 401-7167
FAX:  (412) 281-1007
Email:  wpayne@fdpklaw.com

Ellen M. Doyle
Pamina Ewing
Joel R. Hurt
Ruairi McDonnell

Barry A. Macey
Macey, Swanson & Allman
445 N. Pennsylvania St., Ste.  401
Indianapolis, IN 46204
Phone:  (317) 637-2345
FAX:    (317) 637-2369
Email:  bmacey@maceylaw.com

Feinstein Doyle Payne & Kravec LLC
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh 15219
Phone:  (412) 281-8400
FAX:  (412)  281 1007
Email:  edoyle@fdpklaw.com
Email:  pewing@fdpklaw.com
Email:  jhurt@fdpklaw.com
Email:  rmcdonnell@fdpklaw.com

*Attorneys for Plaintiffs on behalf of themselves and others similarly situated*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 9th day of <u>May</u>, 2017, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following appropriate CM/ECF participants:

Charles C. Warner, Esquire
PORTER WRIGHT MORRIS & ARTHUR LLP
41 South High Street
Columbus, OH  43215
cwarner@porterwright.com

Richard J. Antonelli, Esquire
John A. McCreary, Jr., Esquire
Stephen Antonelli, Esquire
Two Gateway Center, 6th Floor
Pittsburgh, PA 15222
rantonelli@babstcalland.com
jmccreary@babstcalland.com
santonelli@babstcalland.com

Joseph J. Torres, Esquire
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601
Phone:  (312) 558-5600
FAX:   (312) 558-5700
jtorres@winston.com


 s/ William T. Payne
                    William T. Payne